[Cite as *State v. Hartsock*, 2013-Ohio-2571.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO

       Plaintiff-Appellee

v.

ROBERT H. HARTSOCK, II

       Defendant-Appellant


Appellate Case No.    25351

Trial Court Case No.   2011-CR-4375

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

## O P I N I O N

Rendered on the 21st day of June, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. #0070162, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

NICHOLAS G. GOUNARIS, Atty. Reg. No. 0064527, 130 West Second Street, Suite 1818, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1}    Defendant-Appellant, Robert Hartsock, appeals from his conviction and sentence on charges of Burglary, Robbery, and Failure to Comply With an Order or Signal of a Police Officer.  In support of his appeal, Hartsock contends that the State failed to present sufficient evidence to establish his conviction for Burglary.  Hartsock also contends that all his convictions are against the manifest weight of the evidence.

{¶ 2}    We conclude that the conviction for Burglary is supported by sufficient evidence.  We further conclude that the convictions for Burglary, Robbery, and Failure to Comply with an Order or Signal of a Police Officer are not against the manifest weight of the evidence.  Accordingly, the judgment of the trial court will be affirmed.

I.    Facts and Course of Proceedings

{¶ 3}    On December 29, 2011, at around 4:20 a.m., Miamisburg Police Officer, William Kelly, was on foot patrol in the area of Jefferson Street.  The police had received a call about two hours earlier concerning a suspect lurking in the back of a residence on Early Drive, but the investigating officers failed to find anyone in that location.  Based on that call, Kelly decided to do a foot patrol in the general area.

{¶ 4}    During his foot patrol, Kelly first went up Jefferson Street and then walked east on Range Avenue.  While walking east on Range Avenue, Kelly saw an unknown person riding a bicycle south on Wileray Drive.  The bicycle turned left onto Range Avenue, and traveled east towards Cherry Hill Drive.  Kelly could not tell the sex or race of the rider, but noticed that the person's clothing was dark.

**{¶ 5}** Due to the lateness of the hour and the prior call in the neighborhood, Kelly contacted Officer Duff, and asked if he could help locate the person on the bicycle. As Kelly continued to walk down Range Avenue toward Cherry Hill Drive, he saw a male getting into a red SUV that was in the parking lot of an apartment building. The SUV had a rather loud muffler. The SUV turned right out of the parking lot and started coming up Cherry Hill Drive toward the area where Kelly was standing. When the driver came out of the parking lot, he accelerated rather quickly and was driving fast. In order to avoid being hit, Kelly got out of the road and shined his flashlight into the vehicle. He was trying to get the driver's attention to stop. The driver did not stop, but Kelly was able to see that a white male was driving, and that no one else was in the vehicle.

**{¶ 6}** The SUV turned right on Wileray Drive, and within a few seconds, it no longer sounded as if it were traveling away from Kelly. At that point, Kelly radioed for any available unit to come and stop the SUV because he did not know if the driver was intoxicated or was just operating the vehicle extremely recklessly.

**{¶ 7}** Kelly walked back up Range Avenue, and turned onto Wileray Drive. He then saw that the SUV was stopped in front of 423 Wileray Drive, and was parked illegally, facing the wrong direction. The SUV was a Ford Explorer and the back hatch was open. Kelly saw a person make two or three trips, carrying items in his hands between two houses and the car. The person was a white male, about 30 to 40 years of age, of medium build, and was not clean-shaven. The man was wearing a gray Carharrt-style jacket, dark pants, and a toboggan on his head.

**{¶ 8}** Believing that a theft was occurring, Kelly again radioed for help, indicating that

a theft was in progress and that officers should come that way as quickly as they could. When Kelly reached the house adjacent to 423 Wileray Drive, the suspect saw him. At that point, the suspect had several things in his hands. The suspect walked back between the houses, put the objects down, and ran for the SUV.

{¶ 9} Kelly called for the man to stop, but he failed to do so. Kelly also ran towards the SUV, and met the man just as he was getting into the driver's seat. The man was able to push off enough from Kelly to free up a hand and get the car in gear. Kelly threw his flashlight at the man in an attempt to slow him down, but he just kept going. The SUV then went north on Wileray Drive, with the headlights off.

{¶ 10} In the meantime, Miamisburg Police Officer, James Duff, had responded to Kelly's call for assistance. Duff was driving east on Jefferson Street. As he approached Wileray Drive, an SUV came northbound on Wileray Drive, failed to stop at the stop sign, and made a left-hand turn onto Jefferson Street at a high rate of speed. Duff turned his cruiser to the right to avoid a head-on collision, and was struck on the driver's side. The SUV continued down Jefferson and turned on East Early Drive. Duff was able to see the SUV's brake lights go on as the vehicle turned. Duff then tried to follow the vehicle to stop it. He subsequently found the SUV abandoned on West Early Drive, which forms a loop with East Early Drive. A canine unit was summoned and followed a track from West Early Drive to Cherry Hill Drive, where the track ended.

{¶ 11} Officer Kelly indicated that the man in the SUV did not have time to close the back hatch to the SUV when he took off. As a result, the road from Wileray Drive to Jefferson Street was strewn with stolen property. After contacting the people who lived at 423 Wileray,

officers determined that the property had come from their house. The residents confirmed that various items were missing from their kitchen, living room, and garage, including a TV, DVDs, CDs, a video game system, movies, a purse, a wallet, coin change cans kept in the kitchen, and an air compressor. These items were found in the side yard, the street, and in the SUV.

{¶ 12}   The police towed the SUV to the station and inventoried the contents. In addition to the stolen items, they found a pink flashlight with printing on it that said "Temple plus Harts," latex gloves, and a backpack containing the following items: a red-handled hammer; a black-handled hammer; a blue flashlight; three water bottles; a pair of wire cutters; a key chain with a mini leatherman's tool; a compact fingernail kit; and a partial can of Grizzly snuff. They also found a Speedway card and a plastic card that appeared to be a key for a hotel room. The vehicle, itself, had a Kentucky license plate, which did not match the Texas address of the registered owner of the SUV.

{¶ 13}   During the daytime hours of the 29th of December, Detective Threlkeld of the Miamisburg Police Department traced the key card to room 132 of the InTown Suites, which was a hotel located on Kingsridge Drive in Miami Township, Ohio. The police also discovered that the Kentucky license plate had been taken from another red Ford Explorer parked in the lot of the InTown Suites. The license plates had been switched, and the Texas license plate from the Ford Explorer involved in the crime was found on the vehicle in the InTown Suites parking lot.

{¶ 14}   Room 132 was registered to an individual named Samantha Tudor. The police made contact that day with Tudor's mother, Temple Hoskins, who was the only occupant of the room at the time. At that point, nothing further apparently happened with regard to the investigation or apprehension of any suspects.

{¶ 15}   At about 8:30 p.m. on the same day, Officer Kelly went to InTown Suites with Sergeant Thompson of the Miami Township Police, who was assisting with the investigation. As soon as the officers walked into the lobby, they met Samantha Tudor.  The officers asked Tudor if they could go to her room.  Tudor said that her mother and her mother's boyfriend, Robert, were in the room.  However, when Tudor knocked on the door and asked her mother to let her in, there was no response.

{¶ 16}   After the second or third time that Tudor knocked on the door, Sergeant Thompson went around to the back and saw Hartsock coming out of the back window of the room.  Hartsock had on a pair of boxer shorts and a t-shirt.  He was barefoot and did not have on a coat.  Hartsock was handcuffed and was secured in a cruiser.  Kelly noticed that Hartsock matched the description of the person he had dealt with earlier that day.

{¶ 17}   After obtaining consent to search the room, the officers collected a gray Carharrt jacket similar to the one Kelly had seen the suspect wear, and a pair of dark-colored jeans. Hartsock was then transported to the police station.

{¶ 18}   While initially in custody and then later in jail, Hartsock was given *Miranda* warnings.  He was interviewed twice by Detective Threlkeld, and once by Detective Tom Thompson, who was also a member of the Miamisburg Police Department.

{¶ 19}   Hartsock told three different stories about the events leading to his arrest. Hartsock's first story, told to Threlkeld the night of his arrest, was that he had left the hotel on the evening of December 28, 2011, after an argument with his girlfriend.  He met an unknown male outside the hotel.  After the two men struck up a conversation, the male, who was driving an older red Ford Explorer, asked if Hartsock wanted a ride.  After buying beer and driving around,

the unknown man began talking to Hartsock about robberies or thefts. When Hartsock said that he did not want to have anything to do with that, the man let him out of the truck. Hartsock stated that he had slept under an overpass that night, and denied any involvement in a robbery.

{¶ 20} The second story was told to Detective Thompson on December 30, 2011. In the meantime, the police had found the pink flashlight, with "Temple plus Harts," in the vehicle. Hartsock's story again began with an argument that Hartsock had with his girlfriend, Temple. This time, Hartsock went out to the parking lot of the hotel and met a "tall, skinny white boy with acne" named Mike, whom Hartsock had known for a week or two (Trial Transcript, Vol. III, p. 385). Mike was driving a red SUV and asked if Hartsock wanted to "hang out." After they got beer, Mike told him that he needed to move some stuff out of his "old lady's" house. The two men then drove over to the area of Wileray Drive, at which time Hartsock said that he just wanted to drink some beer. Consequently, Mike dropped him off down the road, and Hartsock sat there drinking. Mike said he was going to go down and move stuff out of the house.

{¶ 21} About a half hour or hour later, Mike came back and asked Hartsock if he would help him load the vehicle. Mike then drove toward Cherry Hill Drive and stopped in front of the school, stating that he would walk to the house and would wave Hartsock to come down when he was ready. Hartsock got in the driver's side of the SUV and waited. After some time, Mike waved him down to pick up things. Mike walked behind the house and Hartsock did not see him again. There were things in the yard, including a TV, Xbox, DVDs, and movies. Hartsock began loading things when an officer approached him, and he knew then that he was "in some bullshit." Trial Transcript, Volume III, p. 365. As a result, Hartsock ran to the SUV and began driving. He admitted colliding with the cruiser but said that it happened because the brakes and steering

were not working properly. Hartsock then got out of the vehicle and ran because he was afraid someone had been hurt. He said he spent the night in the woods, sleeping near a swimming pool. Hartsock was not able to further identify "Mike."

{¶ 22} The third story was told to Detective Threlkeld on January 3, 2012. Hartsock stated that he had given the police the incorrect name of Mike, when the person's name was Chris. Hartsock said that he did not know Chris's last name or whereabouts. He described Chris as a white male, again with acne, 33 to 35 years of age. Chris had some red hair and was maybe unshaven or had a goatee.

{¶ 23} Chris told Hartsock to wait around Cherry Hill Drive in the vehicle and said that he needed to go get some property from "his bitch." Trial Transcript, Volume III, p. 421. Chris had promised Hartsock heroin in exchange for his help in removing the property. Hartsock had also injected heroin before these events occurred.

{¶ 24} Chris subsequently waved Hartsock down, at which time Hartsock approached the house to remove the property that Chris had set next to the house. Chris supposedly went back into the house, but Hartsock could not explain where he had gone. Hartsock indicated that he did momentarily think that Chris's girlfriend lived at the house, until he was confronted by the police officer. The rest of the story was essentially the same, with Hartsock claiming that the collision was unintentional and was caused by a brake malfunction.

{¶ 25} Hartsock was charged with Burglary (occupied structure/person present); Robbery (use of force); Receiving Stolen Property; and Failure to Comply with an Order or Signal of a Police Officer (serious physical harm/substantial risk). After the State rested, the trial court granted a Crim.R. 29 motion for acquittal with respect to the charge of Receiving

Stolen Property. The jury then found Hartsock guilty of the remaining charges. Hartsock was sentenced to five years for Burglary and thirty-six months for Robbery. Those sentences were to be served concurrently with each other, but consecutive to a twenty-four month sentence for Failure to Comply, for a total term of incarceration of seven years. Hartsock appeals from his conviction and sentence.

## II. Is the Burglary Conviction Based on Sufficient Evidence?

**{¶ 26}** Hartsock's First Assignment of Error states that:

Hartsock's Conviction for Count 1 Was Not Based on Sufficient Evidence.

**{¶ 27}** Under this assignment of error, Hartsock contends that his conviction for Burglary is based on insufficient evidence, because the State failed to present any evidence that he was inside the residence. Hartsock focuses on his statements that he thought he was helping a friend move property that was located on the lawn; the lack of direct evidence that he was inside the house; and questions the jury asked during deliberations about whether Hartsock had to be inside the structure to be found guilty of burglary.

**{¶ 28}** "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, ¶ 9 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492: 'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal

conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Cherry* at ¶ 9.

{¶ 29}   We have examined the evidence at trial, and conclude that after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of Burglary established beyond a reasonable doubt.

{¶ 30}   Hartsock was charged with having violated R.C. 2911.12(A)(1), which provides that:

> No person, by force, stealth, or deception, shall do any of the following:
>
> (1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense * * *.

{¶ 31}   Officer Kelly testified that he saw a man riding a bicycle south on Wileray Drive.  A short time later, Kelly saw the SUV, with a sole male occupant, drive up Wileray Drive and begin loading property from a home into the car.  Property that had formerly been in the house was in the yard, and the point of entry, an unlocked window, had a patio chair beneath it.  A police dog later tracked the trail from the abandoned SUV to an area where the bicycle could have been stashed.

{¶ 32}    The evidence of Hartsock's entry into the house was circumstantial. However, the Ohio Supreme Court has stressed that:

> Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence.  Hence, we can discern no reason to continue the requirement that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt. We agree with those courts that have held that an additional instruction on the sufficiency of circumstantial evidence invites confusion and is unwarranted. Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt.  Nothing more should be required of a factfinder. (Citations omitted.) *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), *superseded on other grounds by constitutional amendment*, as stated in *State v. Smith*, 80 Ohio St.3d 89, 103, n. 4, 684 N.E.2d 668 (1997).

{¶ 33}    Based on the evidence, the jury was entitled to draw the conclusion that Hartsock rode a bicycle to the crime scene, broke into the house, and then came back with the truck to pick up the property.  Committing the crime in this fashion would have avoided having a suspicious vehicle on the street for an extended period of time and would also have afforded an escape route in the event that things went wrong, as they actually did.  Accordingly, a rational trier of fact could have found Hartsock guilty beyond a reasonable doubt of the crime of

Burglary.

**{¶ 34}** Hartsock's version conflicts with the testimony of the police, but the jury was entitled to believe the State's witnesses. Furthermore, Hartsock told three different versions of what had happened, and the jury was entitled to disbelieve his account.

**{¶ 35}** Based on the preceding discussion, the First Assignment of Error is overruled.

III. Are the Convictions Against the Manifest Weight of the Evidence?

**{¶ 36}** Hartsock's Second Assignment of Error states that:

Hartsock's Convictions for Counts I, III, and IV, Are Against the Manifest Weight of the Evidence.

**{¶ 37}** Under this assignment of Error, Hartsock contends that his convictions on all three charges are against the manifest weight of the evidence. His argument regarding the Burglary and Robbery charges is, again, that he thought that he was helping someone else move property from the lawn into the SUV. Regarding the charge of Failure to Comply with an Order or Signal of a Police Officer, Hartsock maintains that he only hit the police cruiser because the brakes and steering on the SUV failed to work properly.

**{¶ 38}** "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *Thompkins*, 78 Ohio St.3d at 387, 678

N.E.2d 541. "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 39} The case before us is not the exceptional case in which the evidence weighs heavily against the conviction. As we explained, the jury was entitled to weigh both circumstantial and direct evidence, and to disbelieve Hartsock's claim that he was helping someone move. There were credible witnesses who testified otherwise, and there is no reason to doubt their credibility.

{¶ 40} The jury was also entitled to disbelieve Hartsock's story of brake and steering failure. In this regard, Officer Duff testified that he saw the vehicle's brake lights go on when it turned onto Early Drive after having hit his cruiser – so the brakes were apparently working after the accident (leading to the reasonable inference that they worked before the accident as well). Furthermore, Officer Kelly did not testify that the vehicle appeared to be malfunctioning on the two occasions that he saw it being driven before the accident. Accordingly, there is no basis upon which to conclude that the jury clearly lost its way and created a manifest miscarriage of justice.

{¶ 41} Hartsock's Second Assignment of Error is overruled.

IV. Conclusion

{¶ 42} Both of Hartsock's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FAIN, P.J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
Nicholas G. Gounaris
Hon. Dennis J. Adkins